1  LAWRENCE J. HILTON (CA Bar No. 156524)
2  (Pro Hac Vice Application Forthcoming)
   ONE LLP
3  4000 MacArthur Boulevard
   East Tower Ste. 500
4  Newport Beach, California 92660
   Telephone: (949) 502-2870
5  Facsimile: (949) 258-5081
   lhilton@onellp.com

6  David R. Koch (NV Bar #8830)
7  KOCH & SCOW LLC
   11500 S. Eastern Ave., Suite 210
8  Henderson, Nevada 89052
   Telephone: 702.318.5040
9  Facsimile: 702.318.5039
   dkoch@kochscow.com

10
   Attorneys for Plaintiff
11 DONNA MORGAN

12
13              UNITED STATES DISTRICT COURT

14              FOR THE DISTRICT OF NEVADA

15

16 DONNA MORGAN, an individual,          Case No.

17        Plaintiff,                      COMPLAINT FOR:

18     v.                                (1)  VIOLATION OF THE
                                              SECURITIES EXCHANGE ACT
19 MICHAEL BASH, an individual;               OF 1934 AND RULE 10b-5;
   JEREMY BASH, an individual; JANICE   (2)  VIOLATIONS OF CAL. CORP.
20 MCCOWN, an individual; BERKLEY            CODE §§ 25401 AND 25501;
   ENTERPRISES, INC., a Nevada         (3)  PROMISSORY FRAUD;
21 corporation; PEPPERDINE              (4)  BREACH OF CONTRACT;
   ENTERPRISES, INC., a Nevada         (5)  BREACH OF COVENANT OF
22 corporation; NINETY-FIVE FORT             GOOD FAITH AND FAIR
   APACHE COMPLEX, LLC, a Nevada            DEALING
23 limited liability company; ROYAL VIEW,
   LLC, a Nevada limited liability company,
24        Defendants.                    DEMAND FOR JURY TRIAL

25

26

27

28

                                    1
                               COMPLAINT

For her claims against Defendants MICHAEL BASH, JEREMY BASH, JANICE MCCOWN, BERKLEY ENTERPRISES, INC., PEPPERDINE ENTERPRISES, INC., NINETY-FIVE FORT APACHE COMPLEX, LLC, and ROYAL VIEW, LLC (sometimes collectively referred to as "Defendants"), Plaintiff DONNA MORGAN alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. section 1331 and 15 U.S.C. section 78aa.  Venue is proper in this District under 28 U.S.C. section 1391(b) in that one or more of the Defendants resides in this District and that a substantial part of the events giving rise to the claims asserted herein took place within this District.

## THE PARTIES

2.     Plaintiff DONNA MORGAN ("Plaintiff" or "Morgan") is an individual whose principal residence is in San Bernardino County, California.  As a result of Defendants' actions described herein, Morgan sustained injury to her property.

3.     Plaintiff is informed and believes and, on that basis, alleges that Defendant MICHAEL BASH ("M. Bash") is an individual residing in Clark County Nevada.

4.     Plaintiff is informed and believes and, on that basis, alleges that Defendant JEREMY BASH ("J. Bash") is an individual residing in Clark County Nevada.  Plaintiff is further informed and believes and, on that basis, alleges that Jeremy Bash is the son of Michael Bash, M. Bash and J. Bash are sometimes collectively referred to as "the Bashes."

5.     Plaintiff is informed and believes and, on that basis, alleges that Defendant JANICE MCCOWN ("McCown") is an individual residing in Clark County Nevada.

6.     Plaintiff is informed and believes and, on that basis, alleges that Defendant and that BERKLEY ENTERPRISES, INC. ("Berkley") is a corporation organized and existing under the laws of the state of Nevada, with its principal place of business located in Las Vegas, Nevada.  Plaintiff is further informed and believes and, on that basis, alleges that Berkley is influenced, governed and controlled by the Bashes, and that there is such

2

COMPLAINT

1  unity of interest and ownership that Berkley and the Bashes are inseparable from the other.
2  Plaintiff is further informed and believes and, on that basis, alleges that the facts alleged
3  hereinbelow and established at trial show that adherence to the fiction of Berkley as an
4  entity separate from the Bashes would, under the circumstances, sanction a fraud or
5  promote injustice.

6       7.    Plaintiff is informed and believes and, on that basis, alleges that Defendant
7  PEPPERDINE ENTERPRISES, INC. ("Pepperdine") is a corporation existing under the
8  laws of the state of Nevada with its principal place of business located in Las Vegas,
9  Nevada. Plaintiff is further informed and believes and, on that basis, alleges that
10  Pepperdine is influenced, governed and controlled by the Bashes, and that there is such
11  unity of interest and ownership that Pepperdine and the Bashes are inseparable from the
12  other. Plaintiff is further informed and believes and, on that basis, alleges that the facts
13  alleged hereinbelow and established at trial show that adherence to the fiction of
14  Pepperdine as an entity separate from the Bashes would, under the circumstances, sanction
15  a fraud or promote injustice.

16       8.    Plaintiff is informed and believes and, on that basis, alleges that Defendant
17  NINETY-FIVE FORT APACHE COMPLEX, LLC ("Fort Apache") is a limited liability
18  company existing under the laws of the state of Nevada with its principal place of business
19  located in Las Vegas, Nevada. Plaintiff is further informed and believes and, on that basis,
20  alleges that Defendant Berkley is the Manager of Fort Apache.

21       9.    Plaintiff is further informed and believes and, on that basis, alleges that Fort
22  Apache is influenced, governed and controlled by Berkley and the Bashes, and that there is
23  such unity of interest and ownership that Fort Apache, Berkley and the Bashes are
24  inseparable from the other. Plaintiff is further informed and believes and, on that basis,
25  alleges that the facts alleged hereinbelow and established at trial show that adherence to
26  the fiction of Fort Apache as an entity separate from Berkley and the Bashes would, under
27  the circumstances, sanction a fraud or promote injustice.

28

10.     Plaintiff is informed and believes and, on that basis, alleges that Defendant ROYAL VIEW, LLC ("Royal View") is a limited liability company existing under the laws of the state of Nevada with its principal place of business located in Las Vegas, Nevada. Plaintiff is further informed and believes and, on that basis, alleges that Defendant Pepperdine is the Manager of Royal View.

11.     Plaintiff is further informed and believes and, on that basis, alleges that Royal View is influenced, governed and controlled by Pepperdine and the Bashes, and that there is such unity of interest and ownership that Royal View, Pepperdine and the Bashes are inseparable from the other. Plaintiff is further informed and believes and, on that basis, alleges that the facts alleged hereinbelow and established at trial show that adherence to the fiction of Royal View as an entity separate from Pepperdine and the Bashes would, under the circumstances, sanction a fraud or promote injustice.

12.     Plaintiff is informed and believes and, on that basis, alleges that at all times material herein, each of the Defendants was the agent, employee, and/or joint venture of, or working in concert with, co-Defendants and was acting within the course and scope of such agency, employment, and/or joint venture or concerted activity. To the extent that said conduct and omissions were perpetrated by certain Defendants, Plaintiff is informed and believes and, on that basis, alleges that the remaining Defendants confirmed and ratified said conduct and omissions.

**GENERAL ALLEGATIONS**

13.     In 2007, Plaintiff was introduced to M. Bash. M. Bash represented to Plaintiff that at that time that he was affiliated with members of Plaintiff's charitable and philanthropic community.

14.     In or around October and November, 2007, M. Bash, J. Bash, and McCown represented to Plaintiff, and provided written documents to Plaintiff representing that M. Bash and his son, J. Bash, were successful and ethical real estate moguls based in Las Vegas, Nevada who helped other ethical civic-minded people find financial success via

1   carefully selected investments that he described using the terms "sure thing only," "no

2   downside," and "safe" real estate investments.

3       15.     Commencing in December 2007, M. Bash and J. Bash, both (individually

4   and jointly), and via the direct efforts of McCown, (who was a representative of the

5   Bashes, Berkley, Fort Apache, Pepperdine and Royal View, and was authorized to speak

6   on their behalf), invited Plaintiff to meet on numerous occasions.  M. Bash met with

7   Plaintiff in-person, sometimes alone and sometimes accompanied by J. Bash, at various

8   Los Angeles locations, including specifically, the Four Seasons Hotel in Beverly Hills and

9   at Jerry's Delicatessen in Studio City, California between December 2007 through

10  February or March 2008 for additional in-depth investment meetings relating to 95 Fort

11  Apache.

12      16.     During these telephone calls and meetings, M. Bash stated that he and J.

13  Bash were reputable and successful real estate moguls dedicated to offering only "sure

14  thing" real estate investment opportunities to other like-minded ethical investors to gain

15  Plaintiff's trust assuring Plaintiff that there was "no downside" to the investments they

16  offered.  McCown made statements during telephone calls with Plaintiff representing that

17  the Bashes' representations were true, assuring Plaintiff that the investments were very

18  safe and the Bashes were ethical and good men and always successful in in real estate.

19      17.     During the meetings, J. Bash and M. Bash encouraged Plaintiff, to invest in

20  certain "select" real estate opportunities in Las Vegas that the Bashes represented as "no-

21  brainer," "sure thing," "no-downside" and "guaranteed return" investments.  Prior to and

22  following the meetings, McCown made statements representing that the Bashes'

23  representations were true, and personally urged Plaintiff to invest.

24      18.     M. Bash, J. Bash and McCown represented that the Bashes had established

25  longstanding strong personal and professional relationships with city planners, zoning

26  officials, and other government officials relating to Las Vegas real estate, and that they

27  were able to accomplish positive results for investors in the Las Vegas real estate market

28  where other developers could not.  At all times, McCown acted as a key representative for

Defendants.  From November 2007 through January 2008, Plaintiff spoke to McCown by telephone on several occasions, and during those calls McCown actively encouraged and urged Plaintiff to invest with Berkley, Fort Apache and the Bashes.  McCown stated to Plaintiff that she (McCown) worked for the Defendants for a long time in a professional capacity and therefore had personal knowledge that Plaintiff's investment would be safe and successful due to the Bashes' expertise as real estate moguls, their connections with city officials, and their personal ethics.

19.     During these meetings, M. Bash, J. Bash, McCown, and each of them, would often ask Plaintiff personal questions about her family life, spiritual beliefs, and her charitable and civic activities.  Thereafter, M. Bash, J. Bash, and McCown would express similar values and beliefs to create rapport and trust with Plaintiff as part of Defendants' confidence scheme to defraud Plaintiff.

20.     Based on the representations of M. Bash, J. Bash, and McCown and based on the Bashes' purported affinity with Plaintiff's charitable/philanthropic community, Plaintiff was convinced that she could trust Defendants with her money and was convinced that M. Bash and J. Bash would perform as promised.

21.     Plaintiff eventually invested in two separate real estate properties, Ninety-Five Fort Apache and Royal View as follows:

        a.     <u>Ninety-Five Apache</u>:  Real property bearing APN: 125-07-710-002 generally located at the intersection of the 95 Highway and Fort Apache Street in Las Vegas, Clark County, Nevada 89143.  This property was claimed to be held through Defendant Fort Apache, managed by Pepperdine, which is owned, controlled and/or operated by M. Bash and J. Bash.

        b.     <u>Royal View</u>:  Real Property bearing Assessor's Parcel No. 125-08-210-002, Clark County, Nevada, generally located at 8506 N. Fort Apache Road, Las Vegas Nevada 89143.  This property was claimed to be held

1      through Defendant Royal View, managed by Berkley, which is owned,

2      controlled and/or operated by M. Bash and J. Bash.

3      22.    After establishing trust with Plaintiff and as part of Defendants' confidence

4  scheme to defraud Plaintiff, Defendants presented the investment opportunity to Plaintiff

5  during the meetings and telephone calls described above as follows:

6      23.    Ninety-Five Fort Apache:  M. Bash represented that Ninety-Five Fort

7  Apache was a "sure thing" real estate investment with "guaranteed big returns" specifically

8  because (i) the property land would be owned outright by investors with no encumbrances,

9  mortgages or liens, (ii) the property was located in a highly desirable area between the 95

10  Freeway and a very large and growing residential area; (iii) the residents of that

11  community both required and desired the development of the land as a commercial retail

12  service area to serve that residential neighborhood; (iv) the desirable mixed-use

13  development included a grocery store, gas station, retail, offices, and other goods/service

14  providers that were desired by residents; (iv) commercial development plans were already

15  in place, (v) Defendants' had established relationships with both city planners and

16  residents in the community that supported and approved the development, (vi) Defendants

17  had a long-term lease in place that covered costs, property taxes, and the like, (vii)

18  Defendants had additional future lease commitments from future retailers/services (viii)

19  lease income would pay for the construction of the commercial buildings with guaranteed

20  large revenues from rental income.  At all times, McCown acted as a key representative for

21  Defendants, and during telephone calls with Plaintiff made oral statements representing

22  that the Bashes' representations were true, and encouraging and urging Plaintiff to invest.

23      24.    Defendants, via the direct efforts of M. Bash, provided ongoing oral

24  statements and marketing material to Plaintiff on several occasions between November

25  2007 and January 2008, assuring Plaintiff of the safety of her investment monies, including

26  images of Ninety-Five Fort Apache development project and other documents

27  demonstrating the purported high quality of the investment.  McCown reiterated and

28

1 | affirmed the statements by M. Bash and made in the documents and marketing material
2 | during telephone conversations with Plaintiff in the same time period.

3 |      25.    M. Bash and J. Bash, who controlled and were authorized to speak for
4 | Berkley and Fort Apache, represented that there was "no downside" for Plaintiff and only
5 | "upside" as follows: (i) increased value of the land based on the guaranteed commercial
6 | development; (ii) revenue distributions to Plaintiff based on Plaintiff's pro-rata share
7 | arising from the tenant rent; and (iii) if unexpected circumstances occurred, Plaintiff could,
8 | at her option, sell back her units and Defendants would purchase them back in an amount
9 | equivalent to her initial Capital Contribution plus 10% simple interest per annum, and
10 | other assurances. As such, according to the Bashes, Plaintiff's investment would be secure
11 | regardless of real estate market conditions. McCown was a key representative for
12 | Defendants. McCown spoke with Plaintiff via telephone several times between November
13 | 2007 and January 2008, represented that the Bashes' representations were true, and
14 | encouraged and urged Plaintiff to invest.

15 |      26.    Plaintiff was confident that the investment was secure and that the Bashes'
16 | were ethical, trustworthy, sophisticated real estate moguls. As such, a Purchase
17 | Agreement was prepared, which included an Addendum providing for the additional "no
18 | downside only upside" representations made by Michael and J. Bash.

19 |      27.    Defendants originally asked for an investment of approximately
20 | $200,000.00. Plaintiff was not an accredited investor. Plaintiff had never invested in
21 | commercial real estate before. Plaintiff did not want to invest more than $50,000.00 since
22 | her savings were limited. However, Defendants manipulated Plaintiff and, through the
23 | above-mentioned misrepresentations, convinced Plaintiff to invest $100,000.00, a
24 | significant portion of her life savings.

25 |      28.    Based on these representations and promises, on January 21, 2008 Plaintiff
26 | executed a "Fort Apache Complex, LLC Agreement for Purchase of Limited Liability
27 | Company Interest" (the "Fort Apache Purchase Agreement"). And consistent with
28 | Defendants' representations that there was "no downside," the Addendum to the Fort

Apache Purchase Agreement (the "Fort Apache Addendum") provided Plaintiff with an option (the "Fort Apache Option," as further defined below) whereby Fort Apache agreed that Plaintiff could sell her units back to and receive 10% per annum on her investment by exercising that option.  A true and correct copy of the Fort Apache Addendum is attached hereto as Exhibit A.

29.  In or around late January and early February 2011, M. Bash, J. Bash and McCown, who were authorized to speak on behalf of Pepperdine and Royal View, contacted Plaintiff with "an even better" investment, called "Royal View, LLC."

30.  Plaintiff initially did not want to invest further, however, J. Bash, M. Bash, and McCown assured her that the 2008 real estate market problems in Las Vegas were over, and as of 2011, the real estate market in Las Vegas was "back on the rise" (or words to that effect.)

31.  Between late January through March 2011, J. Bash spoke with Plaintiff on the telephone several times and, on or about March 14, 2011 and March 18, 2011, J. Bash met personally with Plaintiff at one or more coffee shops in Glendale, California and Sherman Oaks, California.  During those telephone calls and in-person meetings, J. Bash specifically represented to Plaintiff that the Royal View property was "even better" than Ninety-Five Fort Apache because the Royal View investment opportunity was a "guaranteed short term investment" based on "re-zoning to C-1" with an "anticipated 62% return within a year" because Defendants had a "guaranteed buyer in place who signed a binding letter of intent waiting to purchase the land following the rezoning."  Again, McCown was a key representative who was authorized to speak for Defendants.  McCown spoke with Plaintiff via telephone several times between January 2011 and March 2011, represented that the foregoing was true, and encouraged and urged Plaintiff to invest.

32.  To further coerce Plaintiff to invest, Defendant Royal View, acting at the direction, and under the control of Pepperdine, J. Bash and M. Bash, agreed that Royal View would pay 10% interest on Plaintiff's capital contribution until the rezoning to C-1

1   was complete.  Thereafter the property would be sold with an approximately 62% return
2   on Plaintiff's investment.

3       33.     After many assurances and representations regarding the high value of the
4   Royal Investment, Plaintiff agreed to invest $25,000.00.  However, J. Bash aggressively
5   pursued Plaintiff to increase her investment to $100,000 urging at least $75,000.00.
6   Eventually, Plaintiff was coerced into investing $50,000.00, following assurances by
7   Defendants as to the safety of this investment.  Again, Plaintiff was not an accredited
8   investor, and other than Fort Apache, had never invested in commercial real estate before.

9       34.     Based on these representations and promises, on March 18, 2011 Plaintiff
10  executed a "Royal View, LLC Agreement for Purchase of Limited Liability Company
11  Interest" (the "Royal View Purchase Agreement").  And consistent with Defendants'
12  representations that there was "no downside," the Addendum to the Royal View Purchase
13  Agreement (the "Royal View Addendum") provided Plaintiff with an option (the "Royal
14  View Option," as further defined below) whereby Royal View agreed that Plaintiff could
15  sell her units back to and receive 10% per annum on her investment by exercising that
16  option.  A true and correct copy of the Royal View Addendum is attached hereto as
17  Exhibit B.

18      35.     Plaintiff received monthly interest payments of $416.66 from Royal View
19  during the purported "rezoning phase" until in or around December 2011.  Defendants then
20  represented to Plaintiff that the rezoning to C-1 was complete and ceased making interest
21  payments.

22      36.     Plaintiff waited patiently for the property sale to occur, checking in
23  periodically with Defendants who assured her that the matter was progressing, but that
24  these things "take time."

25      37.     Eventually, in or around 2012, Defendants told Plaintiff that the "buyer fell
26  through" but that they were working with a new buyer for the sale of the property.
27  Defendants reassured Plaintiff that the C-1 zoning was complete, that the property was
28

1  owned 100% by the investors, and that the solution was simply "patience" while the
2  Defendants engaged in good faith efforts to sell the property.

3        38.    In 2013, Plaintiff's husband was diagnosed with brain cancer.  Plaintiff
4  experienced financial hardship and contacted Defendants.  Plaintiff, an unaccredited
5  investor, had invested nearly all of her life savings with Defendants.  Defendants promised
6  to "cash out/buy out" Plaintiff, but stated they needed to make "installment payments over
7  time" to Plaintiff "as money came in" (or words to that effect.)  Defendants made 3
8  payments to Plaintiff between 2013 and 2014.  In or around 2014, M. Bash, J. Bash and
9  McCown stated to Plaintiff in telephone calls that due to "cash flow problems" the
10  installment payments were suspended until the Defendants obtained additional monies.
11  Defendants stated that they "just needed more time" assuring Plaintiff that her investment
12  was safe, and that once the property was sold, Plaintiff would be paid with a significant
13  return on investment.

14        39.    In 2013, after Plaintiff informed Defendants' of her husband's brain cancer
15  diagnosis, M. Bash, J. Bash and McCown began to routinely use purported "health issues"
16  of M. Bash and J. Bash to justify their need for "more time" to ensure that Plaintiff's
17  investment would be successful and profitable.

18        40.    From 2013 onward, McCown would routinely discuss the Bashes "health
19  issues" during telephone calls with Plaintiff, asking Plaintiff for "patience," "compassion,"
20  and "more time," stating,  "[Plaintiff] knows what it is like to deal with medical issues,"
21  and other similar statements, expounding on J. Bash's diabetes and M. Bash's age-related
22  illnesses in a ploy to generate sympathy from Plaintiff.

23        41.    Notwithstanding, Defendants McCown, J. Bash, and M. Bash were fully
24  aware that Plaintiff's husband had been diagnosed with brain cancer and that he was very
25  ill, and they manipulated Plaintiff into believing that the Bashes' health issues were
26  legitimate causes for the investments' failure to perform as promised, and that the
27  investments would succeed as long as Plaintiff gave Defendants "more time" to resolve
28  their "temporary cash flow" problems.

42.     Plaintiff is informed and believes and, on that basis, alleges that while M. Bash and J. Bash may each have certain health issues (as almost all people of a certain age will have), the Bashes exaggerated their health issues as a sympathetic ploy to avoid Plaintiff.  Yet those health issues did not prevent the Bashes from communicating with and holding meetings with potential new investors:  in 2018-2019, Plaintiff learned that while Defendants were evading Plaintiff by alleging health problems, M. Bash and J. Bash were actively seeking out and meeting with new prospective investors to perpetuate their investment schemes.

43.     From 2014 through 2015, Plaintiff's financial hardship became worse.  Plaintiff called the Defendants' several times regarding the status of her investments.  Defendants M. Bash, J. Bash, and McCown rarely responded to Plaintiff's attempts to obtain information regarding her investments.

44.     In or around 2015, Plaintiff's financial situation became dire and her husband's brain cancer was critical.  Plaintiff contacted Defendants, informed them of the urgency of her financial and medical situation, and inquired about Defendants' ability to resume payments to Plaintiff.  Again, Plaintiff's inquiries were generally ignored.  And when Defendants did respond, they stated that there was no money to make the payments and that "you (Plaintiff) have more important problems right now than your investments" (referring to her husband's cancer needs).

45.     From 2015 – 2018, Defendants, via McCown and M. Bash would periodically reassure Plaintiff that while the real estate valued had declined, it was "improving" and they were "working hard" on Fort Apache and Royal View, and that they were working with various companies to develop the properties.  The Defendants' engaged in an ongoing pattern of deception and subterfuge by providing false information about the status of zoning and regular assurances that the Fort Apache and Royal View investments were on track to be successful, requesting that Plaintiff be patient to allow the Bashes to work through their purported health problems and short-term cash flow issues.  M. Bash, J. Bash, and McCown assured Plaintiff that ultimately, Plaintiff's investments

12

1  would be successful and profitable with "big returns" on Fort Apache and an "estimated
2  62% return" on Royal View.

3      46.     Then in September 2018, Plaintiff was contacted by Mr. Robert Ford, who
4  represented himself to be an agent of Defendants.  Mr. Ford represented that Defendants
5  had hired him to administer many real estate investment properties controlled by
6  Defendants, including Fort Apache and Royal View.

7      47.     Plaintiff responded to Mr. Ford's communications and requested additional
8  information on the status of Fort Apache and Royal View.  Plaintiff also provided Mr.
9  Ford with copies of Plaintiff's Addendums and other documents relating to the properties.

10     48.     Mr. Ford communicated with Plaintiff stating that he reviewed the
11 Addendums and acknowledged Plaintiff's right to exercise her option to sell back her units
12 to Defendants for a return of her investment plus interest, as set forth in the Addendums.
13 Robert Ford represented to Plaintiff that the Defendants were willing to buy-out Plaintiff's
14 investment and "make things right" (or words to that effect).

15     49.     From November 2018 through January 2019, Plaintiff and Robert Ford, as
16 agent for Defendants, engaged in significant efforts to resolve Plaintiffs' investment issues
17 relating to Plaintiff's investments.  Draft Purchase Agreements were prepared, but when it
18 came time for the Bashes to sign the Purchase Agreements, the familiar pattern of delay
19 and "needing more time" was employed by Defendants.

20     50.     In or around late 2018/early 2019, Robert Ford eventually communicated to
21 Plaintiff that M. Bash and J. Bash were not going to sign the Purchase Agreements as
22 promised.

23     51.     During the course of Plaintiff's communications with Robert Ford, in
24 October 2018 she received an email communication from Robert Ford that included more
25 than twenty other recipients identified as investors in the Royal View and/or Fort Apache
26 projects.  Prior to that email, Plaintiff had no knowledge of or communication with other
27 investors.  In October 2018 and thereafter, Plaintiff contacted some of the other recipients
28 and learned that they had also purchased interests in investments presented by M. Bash and

J. Bash, for entities under their control under facts similar to Plaintiff's, where the Bashes represented themselves as successful, well-connected real-estate developers who would deliver guaranteed returns through completely safe investments.

52.     On October 22, 2018, Plaintiff sent an inquiry to other investors regarding the zoning status of Royal View.  Plaintiff received e-mail responses from McCown on October 22 and October 25, 2018 relating to Royal View's ostensible re-zoning to C-1, which included a document from The City of Las Vegas.  However, the City of Las Vegas document appeared to contradict Defendants' representations.  In or around late October or November 2018, Plaintiff called the telephone number on the City of Las Vegas document and spoke with a zoning representative who informed Plaintiff that the property was zoned "O" for offices only, and not C-1.  Plaintiff is informed and believes that Defendants plainly lied about the C-1 zoning, to avoid making interest payments to Plaintiff and to prevent her from exercising the Royal View Option.

53.     In late 2018 and early 2019, Plaintiff also learned from other investors that that the Bashes have a long track record of being sued by investors under circumstances strikingly similar to those experienced by Plaintiff in this case.

54.     Until Plaintiff learned of the other victims of the Bashes through the email communications with other investors in or around October 2018, she did not know and could not have discovered through the exercise of reasonable diligence that the Defendants, including the Bashes, had procured her investments through fraud and deception with a long history of engaging in similar "confidence schemes" with other investors.  The Bashes used their purported affinity with Plaintiff's social and charitable causes and their representations about their successful real estate backgrounds to instill in Plaintiff a sense of trust and had engaged in "affinity fraud" behavior with other investors by purporting to be members of certain close-knit religious organizations.

55.     Then, when the investments did not initially perform as promised, the Bashes used their purported illnesses as a justification knowing that Plaintiff, whose own husband

had developed and ultimately died of brain cancer, would be susceptible to that form of manipulation.

56.     Based on their conduct and actions, Plaintiff is informed and believes that Defendants had no good faith intention, rather they used false promises and ploys to string Plaintiff along in a pattern of subterfuge and delay.

57.     On February 20 and 21, 2019, Plaintiff duly provided written notice via certified mail to Defendants and their managers, whereby Plaintiff formally gave notice of her election to exercise her options pursuant to the signed written Addenda to sell her units in Fort Apache and Royal View, respectively, back to Defendants in accordance with the terms of the respective Addenda.

58.     Defendants, in writing, rejected Plaintiff's demand that Royal View repurchase her units in accordance with the terms of the Royal View Addendum, and also rejected Plaintiff's demand that Fort Apache repurchase her units in accordance with the terms of the Fort Apache Addendum.

## FIRST CLAIM FOR RELIEF

### (Violation of Securities Exchange Act of 1934 and Rule 10b-5

### Against Defendants J. Bash, M. Bash, Fort Apache, and Berkley

### —Fort Apache Investment)

59.     Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

60.     Based on the representations of J. Bash and M. Bash, Plaintiff understood that she would be acquiring the Fort Apache Interests as passive investments in a common enterprise, and that she would earn the profits promised by Defendants solely through the efforts of the Defendants or of someone other than her own efforts.

61.     The Fort Apache Addendum includes a put option (the "Fort Apache Option"), providing Plaintiff with the right to demand that Fort Apache purchase the Fort Apache Interests from her at a pre-determined price upon the occurrence of certain triggering events.

62.     The Fort Apache Option was material to Plaintiff's decision to purchase the Fort Apache Interests because, among other things, it was represented to be a grant of rights to Plaintiff allowing her to liquidate her investment in Fort Apache upon the occurrence of certain events (the "Triggering Events") and to earn a minimum rate of return on her investment.  A reasonable investor would have considered the inclusion of the Fort Apache Option to be important in deciding whether to purchase the Fort Apache Interests.

63.     In reliance on the representations of Defendants M. Bash, J. Bash, Fort Apache and Berkley that Plaintiff's investment would have "no downside" because of the right to exercise the Fort Apache Option and the express language of the Fort Apache Option, Plaintiff purchased the Fort Apache Interests for the sum of $100,000.

64.     At least one of the Triggering Events has occurred, and Plaintiff has given written notice to Fort Apache of her exercise of the Fort Apache Option.

65.     Fort Apache has refused to perform its obligations under the Fort Apache Option.

66.     Unbeknownst to Plaintiff, at the time Defendants M. Bash, J. Bash, Fort Apache and Berkley induced her to purchase the Fort Apache Interests with assurances that there was "no downside," Defendants did not intend to allow Plaintiff to exercise her rights under the Fort Apache Option and the option was therefore worthless to Plaintiff. Defendants' intention not to perform at the time the Fort Apache Addendum was signed is evidenced by, among other things, Defendants' acts and omissions shortly after the Fort Apache Option was purchased.  The acts and omissions include Defendants' failure to even attempt to perform the activities upon which the Triggering Events were based, their concealment of facts and false statements of facts to prevent Plaintiff from discovering that one or more Triggering Events had occurred, and their continued assurances of performance using phony or exaggerated health problems as an excuse for delay.

67.     Defendants M. Bash, J. Bash, Fort Apache and Berkley concealed from Plaintiff their knowledge that the Fort Apache Option would never be honored and was

therefore worthless.  The concealment was material in that a reasonable investor would have considered the facts that were the subject of the concealment to be important in deciding whether to purchase the Fort Apache Membership Interests and the Fort Apache Option.  No amount of diligence could have uncovered Defendants M. Bash, J. Bash, Fort Apache and Berkley's secret and undisclosed intention not to honor the terms of the Fort Apache Option.

68.     Defendants M. Bash, J. Bash, Fort Apache and Berkley concealed from Plaintiff their knowledge that the Fort Apache Option would never be exercised with the intention, and for the purpose, of inducing Plaintiff to purchase the Fort Apache Interests. Plaintiff did, in fact, rely on the concealment of material facts in deciding to purchase the Fort Apache Interests.

69.     As a direct and proximate result of the concealment of material facts by Defendants M. Bash, J. Bash, Fort Apache and Pepperdine, Plaintiff suffered damages in that she paid $100,000 in exchange for the Fort Apache Interests.

70.     Plaintiff is informed and believes and, on that basis, alleges that at the time of the acts and omissions alleged herein, Defendant Berkley was the Manager of Defendant Fort Apache, and directly or indirectly controlled the acts and omissions of Fort Apache.  Plaintiff is further informed and believes and, on that basis, alleges that Defendants M. Bash, J. Bash and DOES 6 through 10, directly or indirectly, controlled Defendant Berkley, and that M. Bash, J. Bash and DOES 1 through 5 authorized and/or directly participated in the misrepresentations and concealments alleged hereinabove. Defendants Berkley, M. Bash, J. Bash and DOES 1 through 5 are therefore jointly and severally liable for such acts and omissions pursuant to 15 U.S.C. § 78t(a).

## SECOND CLAIM FOR RELIEF

### (Violation of Securities Exchange Act of 1934 and Rule 10b-5

### Against Defendants J. Bash, M. Bash, Royal View, Pepperdine—Royal View

### Investment)

71.     Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

72.     Based on the representations of J. Bash and M. Bash, Plaintiff understood that she would be acquiring the Royal View Interests as passive investments in a common enterprise, and that she would earn the profits promised by Defendants solely through the efforts of the Defendants or of someone other than her own efforts.

73.     The Royal View Addendum includes a put option (the "Royal View Option"), providing Plaintiff with the right to demand that Royal View purchase the Royal View Interests from her at a pre-determined price upon the occurrence of certain triggering events.

74.     The Royal View Option was material to Plaintiff's decision to purchase the Royal View Interests because, among other things, it was represented to be a grant of rights to Plaintiff allowing her to liquidate her investment in Royal View upon the occurrence of certain events (the "Triggering Events") and to earn a minimum rate of return on her investment.  A reasonable investor would have considered the inclusion of the Royal View Option to be important in deciding whether to purchase the Royal View Interests.

75.     In reliance on the representations of Defendants M. Bash, J. Bash, Royal View and Pepperdine that Plaintiff's investment would have "no downside" because of the right to exercise the Royal View Option and the express language of the Royal View Option, Plaintiff purchased the Royal View Interests for the sum of $50,000.

76.     At least one of the Triggering Events has occurred, and Plaintiff has given written notice to Royal View of her exercise of the Royal View Option.

77.   Royal View has refused to perform its obligations under the Royal View Option.

78.   Unbeknownst to Plaintiff, at the time Defendants M. Bash, J. Bash, Royal View and Pepperdine induced her to purchase the Royal View Interests with assurances that there was "no downside," Defendants did not intend to allow Plaintiff to exercise her rights under the Royal View Option and the option was therefore worthless to Plaintiff. Defendants' intention not to perform at the time the Royal View Addendum was executed is evidenced by, among other things, Defendants' acts and omissions shortly after the Royal View Option was purchased.  The acts and omissions include Defendants' failure to even attempt to perform the activities upon which the Triggering Events were based, their concealment of facts and false statements of facts to prevent Plaintiff from discovering that one or more Triggering Events had occurred, and their continued assurances of performance using phony or exaggerated health problems as an excuse for delay.

79.   Defendants M. Bash, J. Bash, Royal View and Pepperdine concealed from Plaintiff their knowledge that the Royal View Option would never be honored and was therefore worthless.  The concealment was material in that a reasonable investor would have considered the facts that were the subject of the concealment to be important in deciding whether to purchase the Royal View Membership Interests and the Royal View Option.  No amount of diligence could have uncovered Defendants M. Bash, J. Bash, Royal View and Pepperdine's secret and undisclosed intention not to honor the terms of the Royal View Option.

80.   Defendants M. Bash, J. Bash, Royal View and Pepperdine concealed from Plaintiff their knowledge that the Royal View Option would never be exercised with the intention, and for the purpose, of inducing Plaintiff to purchase the Royal View Interests. Plaintiff did, in fact, rely on the concealment of material facts in deciding to purchase the Royal View Interests.

81.     As a direct and proximate result of the concealment of material facts by Defendants M. Bash, J. Bash, Royal View and Pepperdine, Plaintiff suffered damages in that she paid $50,000 in exchange for the Royal View Interests.

82.     Plaintiff is informed and believes and, on that basis, alleges that at the time of the acts and omissions alleged herein, Defendant Pepperdine was the Manager of Defendant Royal View, and directly or indirectly controlled the acts and omissions of Royal View.  Plaintiff is further informed and believes and, on that basis, alleges that Defendants M. Bash, J. Bash and DOES 1 through 5, directly or indirectly, controlled Defendant Pepperdine, and that M. Bash, J. Bash and DOES 1 through 5 authorized and/or directly participated in the misrepresentations and concealments alleged hereinabove. Defendants Pepperdine, M. Bash, J. Bash and DOES 1 through 5 are therefore jointly and severally liable for such acts and omissions pursuant to 15 U.S.C. § 78t(a).

## THIRD CLAIM FOR RELIEF

### (Violation of California Corporations Code §§ 25401, 25501

### Against Defendants M. Bash, J. Bash, McCown, Berkley, Fort Apache)

83.     Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

84.     In performing the acts alleged in the sale of the Fort Apache Interests  to Plaintiff, many of which acts took place in the State of California during Plaintiff's face-to-face meetings with the Bashes, and via U.S. Mail and telephone with Defendant McCown, Defendants M. Bash, J. Bash, McCown, Berkley and Fort Apache violated Sections 25401 and 25501 of the California Corporations Code by offering or selling a security in the State of California by means of written and oral communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.   The misrepresentations and omissions were material in that a reasonable investor would have considered the facts that were the subject of the misrepresentations to be important in deciding whether to acquire the Fort Apache Interests.

86.   The misrepresentations were false, and were made by Defendants M. Bash, J. Bash, McCown, Berkley and Fort Apache with the intent to induce reliance on the part of Plaintiff.

87.   Plaintiff justifiably relied on the omissions of Defendants M. Bash, J. Bash, McCown, Berkley and Fort Apache by paying $100,000 for the Fort Apache Interests.

88.   Plaintiff is informed and believes and, on that basis, alleges that at the time of the Fort Apache transaction, Berkley was the Manager of Fort Apache and controlled Fort Apache, and Defendants M. Bash, J. Bash and DOES 11 through 15 controlled Pepperdine.  Defendants Pepperdine, M. Bash, J. Bash and DOES 11 through 15 are therefore jointly and severally liable pursuant to Section 25504 of the California Corporations Code.

## FOURTH CLAIM FOR RELIEF

### (Violation of Cal. Corporations Code §§ 25401, 25501 Against Defendants M. Bash, J. Bash, McCown, Pepperdine, Royal View)

89.   Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

90.   In performing the acts alleged in the sale of the Royal View Interests to Plaintiff, many of which acts took place in the State of California during Plaintiff's face-to-face meetings with the Bashes, and via U.S. Mail and telephone with Defendant McCown, Defendants M. Bash, J. Bash, Pepperdine and Royal View violated Sections 25401 and 25501 of the California Corporations Code by offering or selling a security in the State of California by means of written and oral communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     The misrepresentations and omissions were material in that a reasonable investor would have considered the facts that were the subject of the misrepresentations to be important in deciding whether to acquire the Royal View Interests.

92.     The misrepresentations were false, and were made by Defendants M. Bash, J. Bash, McCown, Pepperdine and Royal View with the intent to induce reliance on the part of Plaintiff.

93.     Plaintiff justifiably relied on the omissions of Defendants M. Bash, J. Bash, McCown, Pepperdine and Royal View by paying $50,000 for the Royal View Interests.

94.     Plaintiff is informed and believes and, on that basis, alleges that at the time of the Royal View transaction, Pepperdine was the Manager of Royal View and controlled Royal View, and Defendants M. Bash, J. Bash and DOES 16 through 20 controlled Pepperdine.  Defendants Pepperdine, M. Bash, J. Bash and DOES 16 through 20 are therefore jointly and severally liable pursuant to Section 25504 of the California Corporations Code.

## FIFTH CLAIM FOR RELIEF

### (Promissory Fraud Against Defendants M. Bash, J. Bash, McCown Berkley, Pepperdine, Fort Apache and Royal View)

95.     Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

96.     Defendants M. Bash, J. Bash, McCown, Berkley and Fort Apache each promised Plaintiff that she could sell, and that Fort Apache would buy, Plaintiff's interests in Fort Apache upon the occurrence of the Triggering Events set forth in the Fort Apache Addendum.

97.     In reasonable reliance on the representations and promises of Defendants M. Bash, J. Bash, McCown, Berkley and Fort Apache that Plaintiff's investment would have "no downside" because of the right to exercise the Fort Apache Option and the express language of the Fort Apache Option, Plaintiff purchased the Fort Apache Interests for the sum of $100,000.

98.     At least one of the Triggering Events set forth in the Fort Apache Addendum has occurred, and Plaintiff has given written notice to Fort Apache of her exercise of the Royal View Option.

99.     Fort Apache has refused to perform its obligations under the Fort Apache Option.

100.     Unbeknownst to Plaintiff, at the time Defendants M. Bash, J. Bash, McCown, Fort Apache and Berkley induced her to purchase the Fort Apache Interests with assurances that there was "no downside," Defendants did not intend to allow Plaintiff to exercise her rights under the Fort Apache Option and the option was therefore worthless to Plaintiff.  Defendants' intention not to perform is evidenced by, among other things, Defendants' acts and omissions shortly after the Fort Apache Option was purchased.  The acts and omissions include Defendants' failure to even attempt to perform the activities upon which the Triggering Events were based, their concealment of facts and false statements of facts to prevent Plaintiff from discovering that one or more Triggering Events had occurred, and their continued assurances of performance using phony or exaggerated health problems as an excuse for delay.

101.     As a direct and proximate result of the concealment of material facts by Defendants M. Bash, J. Bash, McCown, Berkley and Fort Apache, Plaintiff suffered damages in that she paid $100,000 in exchange for the Fort Apache Interests.

102.     Defendants M. Bash, J. Bash, McCown, Pepperdine and Royal View each promised Plaintiff that she could sell, and that Royal View would buy, Plaintiff's interests in Royal View upon the occurrence of the Triggering Events set forth in the Royal View Addendum.

103.     In reasonable reliance on the representations and promises of Defendants M. Bash, J. Bash, McCown, Pepperdine and Royal View that Plaintiff's investment would have "no downside" because of the right to exercise the Royal View Option and the express language of the Royal View Option, Plaintiff purchased the Royal View Interests for the sum of $50,000.

104.   At least one of the Triggering Events set forth in the Royal View Addendum has occurred, and Plaintiff has given written notice to Royal View of her exercise of the Royal View Option.

105.   Royal View has refused to perform its obligations under the Royal View Option.

106.   Unbeknownst to Plaintiff, at the time Defendants M. Bash, J. Bash, McCown, Pepperdine and Royal View induced her to purchase the Royal View Interests with assurances that there was "no downside," Defendants did not intend to allow Plaintiff to exercise her rights under the Royal View Option and the option was therefore worthless to Plaintiff. Defendants' intention not to perform is evidenced by, among other things, Defendants' acts and omissions shortly after the Royal View Option was purchased. The acts and omissions include Defendants' failure to even attempt to perform the activities upon which the Triggering Events were based, their concealment of facts and false statements of facts to prevent Plaintiff from discovering that one or more Triggering Events had occurred, and their continued assurances of performance using phony or exaggerated health problems as an excuse for delay.

107.   As a direct and proximate result of the concealment of material facts by Defendants M. Bash, J. Bash, McCown, Pepperdine and Royal View, Plaintiff suffered damages in that she paid $50,000 in exchange for the Royal View Interests.

108.   The acts and omissions of Defendants alleged hereinabove were done with malice, justifying and award of punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract Against Defendant Fort Apache)

109.   Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

110.   Plaintiff and Fort Apache were parties to the Fort Apache Purchase Agreement, including the Fort Apache Addendum.

111.   Fort Apache has breached the Fort Apache Purchase Agreement and the Fort Apache Addendum by failing to perform its obligation to repurchase Plaintiff's interests in Fort Apache on the terms set forth in the Fort Apache Addendum.

112.   Plaintiff has performed all of her obligations under the Fort Apache Purchase Agreement and the Fort Apache Addendum, except for such obligations as are excused by Fort Apache's breach.

113.   As a direct and proximate result of Fort Apache's breach, Plaintiff has been damaged in an amount to be proved at trial, but at least $190,000, exclusive of interest and costs.

114.   The Fort Apache Purchase Agreement provides that in any action to enforce the terms of the agreement, the prevailing party is entitled to recover its reasonable attorneys' fees.

**SEVENTH CLAIM FOR RELIEF**

**(Breach of Contract Against Defendant Royal View)**

115.   Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

116.   Plaintiff and Royal View were parties to the Royal View Purchase Agreement, including the Royal View Addendum.

117.   Royal View has breached the Royal View Purchase Agreement and the Royal View Addendum by failing to make the monthly interest payments due to Plaintiff. Plaintiff did not discover, and could not have discovered, this breach by Royal View until late 2018 or early 2019 because Royal View falsely represented to Plaintiff in or around December, 2011 that the Royal View property had been rezoned to C-1 when in fact, the property had (and to this day has not) been rezoned to C-1.

118.   Royal View has also breached the Royal View Purchase Agreement and the Royal View Addendum by failing to perform its obligation to repurchase Plaintiff's interests in Royal View on the terms set forth in the Royal View Addendum.

119.   Plaintiff has performed all of her obligations under the Royal View Purchase Agreement and the Royal View Addendum, except for such obligations as are excused by Royal View's breach.

120.   As a direct and proximate result of Fort Apache's breach, Plaintiff has been damaged in an amount to be proved at trial, but at least $90,000, exclusive of interest and costs.

121.   The Royal View Purchase Agreement provides that in any action to enforce the terms of the agreement, the prevailing party is entitled to recover its reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing

### Against Defendant Fort Apache)

122.   Plaintiff realleges and incorporates herein by this reference all previous allegations in this Complaint as if set forth in full herein.

123.   Plaintiff and Fort Apache were parties to the Fort Apache Purchase Agreement, including the Fort Apache Addendum, which are governed by Nevada law.

124.   In every contract there is an implied covenant of good faith and fair dealing, which imposes a duty on each of the parties not to do anything to destroy or injure the right of the other to receive the benefits of the contract.  Thus, each party has the duty not to prevent or hinder performance by the other party.

125.   The actions of Fort Apache alleged above constitute a breach of the implied covenant of good faith and fair dealing.

126.   Plaintiff has performed all of her obligations under the Fort Apache Purchase Agreement and the Fort Apache Addendum, except for such obligations as are excused by Fort Apache's breach.

127.   As a direct and proximate result of Fort Apache's breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be proved at trial, but at least $190,000, exclusive of interest and costs.

1    128.   The Fort Apache Purchase Agreement provides that in any action to enforce

2  the terms of the agreement, the prevailing party is entitled to recover its reasonable

3  attorneys' fees.

4  **NINTH CLAIM FOR RELIEF**

5  **(Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant**

6  **Royal View)**

7    129.   Plaintiff realleges and incorporates herein by this reference all previous

8  allegations in this Complaint as if set forth in full herein.

9    130.   Plaintiff and Royal View were parties to the Royal View Purchase

10  Agreement, including the Royal View Addendum, which are governed by Nevada law. In

11  every contract there is an implied covenant of good faith and fair dealing, which imposes a

12  duty on each of the parties not to do anything to destroy or injure the right of the other to

13  receive the benefits of the contract. Thus, each party has the duty not to prevent or hinder

14  performance by the other party.

15    131.   The actions of Royal View alleged above constitute a breach of the implied

16  covenant of good faith and fair dealing.

17    132.   Plaintiff has performed all of her obligations under the Royal View Purchase

18  Agreement and the Royal View Addendum, except for such obligations as are excused by

19  Royal View's breach.

20    133.   As a direct and proximate result of Royal View's breach of the implied

21  covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be

22  proved at trial, but at least $90,000, exclusive of interest and costs.

23    134.   The Royal View Purchase Agreement provides that in any action to enforce

24  the terms of the agreement, the prevailing party is entitled to recover its reasonable

25  attorneys' fees.

26

27

28

## PRAYER

WHEREFORE, Plaintiff prays for relief as set forth below.

1. On all claims for relief, for an award of compensatory damages according to proof;

2. On the Fifth Claim for Relief, for an award of punitive and exemplary damages;

3. For an award of prejudgment interest;

4. For an award of reasonable attorneys' fees and costs; and

5. Such other and further relief as the Court deems just and proper.

DATED: April 1, 2019                    KOCH & SCOW, LLC

By: _____
            David R. Koch, Esq.

Attorneys for Plaintiff
DONNA MORGAN

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues triable to a jury.

DATED:  April 1, 2019                               KOCH & SCOW, LLC

By: _____
        David R. Koch, Esq.

Attorneys for Plaintiff
DONNA MORGAN

COMPLAINT